## THE P. R. R. NO. 35.
## THE EUGENIA MORAN.

**CLEARY BROS., Inc., v. PENNSYLVANIA R. CO., et al.**

### No. 341.

Circuit Court of Appeals, Second Circuit.
May 9, 1932.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Paul Tison, both of New York City, of counsel), for appellant.

Foley & Martin, of New York City, for appellee Cleary Bros., Inc.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan, of New York City, of counsel), for appellee Moran Towing & Transportation Co.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The libelant is the owner of the barge Freedom. It sued the steamtug P. R. R. No. 35, alleging negligent towage whereby the Freedom was brought into collision with the center abutment of the Baltimore & Ohio bridge over the Arthur Kill and was so injured that she sank. The Pennsylvania Railroad Company appeared as claimant and impleaded the steamtug Eugenia Moran under the 56th Rule (28 USCA § 723). The Moran Towing & Transportation Company appeared as claimant for that tug. The P. R. R. No. 35 was held solely at fault and appealed.

The evidence is conflicting and the only substantial issues involved in this appeal relate to questions of fact. In several important respects the testimony of witnesses cannot be reconciled on any reasonable basis and our problem has resolved itself into determining what evidence it is reasonable to believe reflects the truth. The facts which we believe were fairly established are not materially different from those found by the trial judge.

On the evening of March 26, 1928, the tug Eugenia Moran with two loaded deck scows in tow tandem on two hawsers came down the Arthur Kill against a flood tide on her way to Perth Amboy. It was dark; the weather clear and the wind southwest. Such a tide as was then running sets over against the Jersey side at a point not far above the Baltimore & Ohio bridge. This bridge has a center abutment 510 feet long which divides the Arthur Kill into two channels at that point. Each of these channels is about 200 feet wide. There are piers on the Jersey side just above the bridge at which boats are often moored. All this makes it difficult for a hawser tow going down the Kill against a flood tide to use the draw on the Jersey side because under these circumstances a problem involving rather nice calculation must be correctly solved to avoid bringing the tow up against either the Jersey side piers or boats which may be lying at them or against the center abutment of the bridge. The master of the Eugenia Moran could make out barges then along the Jersey shore above the bridge. At the time nothing could be seen coming below the bridge. The master accordingly decided to take the draw on the Staten Island, or his port, side. This gave him a straight course which did away with all the danger inherent in taking the draw on the Jersey side, but on the other hand took him to his port side of the Kill. The Narrow Channel Rule (33 USCA § 210) does apply in the Arthur Kill and did apply to the Eugenia Moran at this time. Of course, it required her to keep on the starboard side of the channel so far as it was safe and practical to do so. Although there was ample evidence to show that hawser tows could and did take the Jersey side draw without mishap, under such conditions as then prevailed, the danger inherent in so doing was so plain that it was not safe and practical for the Eugenia Moran then to keep on her starboard side to do so. Her master then had two choices available. One was to wait above the bridge and the other was to take the Staten Island draw. The evidence shows that prudent navigation, after a decision against using the Jersey draw, required him to wait above the bridge unless something was seen coming up below the bridge, or was expected to come up, to interfere with his going through on the Staten Island side. He could then see nothing below the bridge at least as far as Buckwheat Island, which was about a mile down, and so was, we think, justified in concluding that he could safely use the Staten Island draw and get back to his starboard side of the channel after he had gone through the bridge without interference with the navigation of others. While such a course was proved to be customary, we place no reliance on the custom as a justification, but hold that he did not violate the narrow channel rule since it was not safe and practical for him to keep on the starboard side. His choice to proceed on the port side was justified by the fact that he knew there was a mile of that side of the channel in the clear below the bridge and nothing within that limit with which he would interfere. He made for the Staten Island draw and was about halfway through when he heard the bridge signal as it would in answer to a request to open or remain open. He then saw an upbound tug and tow, which turned out to be the P. R. R. No. 35 and her flotilla, near Buckwheat Island about a mile away. Signals were then exchanged between these two tugs. The evi-

dence as to them is very conflicting, and it does not appear to be necessary to decide just what those signals were anyway, as they do not seem to have had any effect on the subsequent navigation of either tug. The evidence of the Moran was that she answered a one-blast signal with an alarm and put on full speed ahead. That when she cleared the draw, she signaled The P. R. R. No. 35 with one blast which the P. R. R. No. 35 answered with an alarm. However these signals may have been given, and the version of the P. R. R. No. 35 about that will appear later, the Eugenia Moran and her tow went on to the new bridge some 600 to 1,000 feet below the Baltimore & Ohio bridge and there tied up to a scow without hitting anything.

The tug P. R. R. No. 35 came up the Arthur Kill that night on her way from South Amboy to New York with thirteen loaded coal boats in tow in four tiers having three boats abreast and a single boat astern on the starboard side of the last tier. The Freedom was in this tow. When this tug came to Buckwheat Island she saw the staff lights of a vessel in the channel at the Baltimore & Ohio bridge. Owing to the fact that the Arthur Kill above Buckwheat Island bends to starboard around Howland Hook, the P. R. R. No. 35 could, not tell whether the vessel whose staff lights she saw was on the Jersey or Staten Island side of the channel. She then gave a one-blast signal to this vessel and kept on. To that signal no answer was heard. The P. R. R. No. 35 kept on around Howland Hook and when about to make the Hook gave another one-blast signal and heard a two-blast reply. She could then safely have turned her tow in the channel and held back. There was a rock drill in the Kill above Howland Hook which made it impossible for her to turn and hold back when once she had rounded the Hook. She kept on. Her speed was from 3 to 4 miles per hour and was about twice that of the Eugenia Moran. When the tail of the tow of the No. 35 was about clear of the rock drill, the Brinton, a helper tug, arrived and hooked up with a hawser of about 10 fathoms to the stern of the last boat. As nearly as can be determined, the No. 35 gave a two-whistle signal and started for the Jersey side just as she passed the rock drill and the Brinton was hooked up so that she soon could and did pull toward the Jersey side on the stern of the last boat. Then the Moran gave a one-whistle signal which the No. 35 answered with two whistles and followed that signal with an alarm. The No. 35 kept on for the draw on the Jersey side but failed to make it even with the help of the Brinton and brought the middle of her tow up against the center abutment of the Baltimore & Ohio bridge. The Freedom sank and part of the other boats went through on one side, part on the other side, of the center abutment.

From all this it is certain that the Moran was actually part way through the draw on the Staten Island side when the No. 35 then at Buckwheat Island saw her lights. In spite of the fact that the evidence on the part of the No. 35 is to the effect that the lights on the bridge were too dim to enable her to determine which side of the channel the Moran was using to go through the bridge, it is almost beyond belief that this could be so. However, if the No. 35 is given the benefit of this evidence, she must nevertheless be charged with knowledge that a boat was then in one draw or the other and may have been in the Staten Island draw. If that boat was in the Staten Island draw the duty of the No. 35 to hold back was plain. She knew she must hold back, if at all, below Howland Hook, for the rock drill would prevent her so doing once she came to that. Having rounded the Hook she had to decide whether to keep on her starboard side to the Staten Island draw in the hope that it would be clear in time or pull for the Jersey side. She chose the latter course and met disaster, although it now seems fairly clear that she could have safely kept to starboard and gone through the Staten Island draw, for the Moran must have been below the tow of the No. 35 before the center abutment was hit, or she could not have escaped collision with the tow herself. But the real fault of the No. 35 was in negligently rounding the Hook and getting into the close quarters which compelled her to decide at her peril how to extricate herself from the trouble into which she had so carelessly gone when, if she did not know that the draw in which she would ordinarily have the right of way was not available for her use, she had good reason to believe that it was not, and could have avoided all trouble by holding back.

Decree affirmed.